IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Pamela B. Craig, | ) | C/A No. 3:05-950-CMC |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT |
| | ) | AND |
| vs. | ) | CONCLUSIONS OF LAW |
| | ) | |
| Jefferson Pilot Financial Insurance Company, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

This matter is before the court for ruling on the merits based on the written submissions of the parties.[1] These written submissions include the administrative record which the parties have filed with their Joint Stipulation. Joint Stipulation, Exhibit A.[2] For the reasons set forth below, the court finds that Defendant, Jefferson Pilot Financial Insurance Company, did not abuse its discretion in denying Plaintiff's claim for disability benefits. The court, therefore finds that Defendant is entitled to judgment in its favor on Plaintiff's claim for benefits. The court declines, however, to award attorneys' fees to Defendant.

**DECISION OF THE COURT**

After examining the administrative record, joint stipulation, and parties' memoranda, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

---

[1] This follows the normal procedure of this court in resolving actions for benefits under the Employee Retirement Income Security Act of 1976, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and is with the consent of the parties. *See* Joint Stipulation at 1 (filed August 22, 2005).

[2] All evidentiary references herein are to Exhibit A to the Joint Stipulation. These pages are denominated JPFCL00001-JPFCL00212 in Exhibit A (cited herein in shortened form as "Record at 1-212").

**FINDINGS OF FACT**

1. Plaintiff was, at all times relevant to her claim for benefits, a participant in an employee welfare benefit plan which provided both short-term and long-term disability benefits. The benefits at issue were provided through an insurance policy offered and administered by Defendant. Joint Stipulation ¶ 5; Record at 1-49 ("Plan").

2. Pursuant to the terms of the Plan, Defendant had the responsibility for determining Plaintiff's eligibility for insurance and entitlement to benefits. Defendant was vested with discretion in making these determinations but also had a financial interest in the decision. Joint Stipulation ¶¶ 6 & 7; Record at 45.

3. The Plan defines total disability as "the Insured Person's inability, due to Sickness or Injury, to perform each of the main duties of his or her regular occupation. A person engaging in any employment for wage or profit is not totally disabled." Joint Stipulation ¶ 6; Record at 49.

4. The Plan excludes coverage for any "Sickness or Injury covered by Worker's Compensation" or "which is due to a Sickness or Injury arising out of, or in the course of, any employment for wage or profit." Joint Stipulation ¶ 6; Record at 47.

5. Plaintiff ceased work on September 10, 2003. Nine days later, she was seen by Gregory Fulcher, M.D., of the Lexington Medical Center-Chapin. Dr. Fulcher's notes of this September 19, 2003 office visit indicate Plaintiff was being seen both for stress and anxiety related to work and for shoulder pain from a non-work related injury dating back several years. Record at 143-144 (also indicating that he had completed an "FMLA" form, giving Plaintiff a tentative return to work date of October 27, 2003).

6. On or about the same time, Dr. Fulcher completed portions of a disability application on Plaintiff's behalf. The portions he completed indicate that Plaintiff was disabled by a

combination of difficulties including left shoulder pain, panic disorder, depression and anxiety. Record at 211-12 (initial short-term disability application signed by Dr. Fulcher and dated September 20, 2003.)

7.  Defendant initially approved payment of benefits under a short-term disability policy for the period beginning September 24, 2003, through October 27, 2003.[3]  Record at 209.  In its October 7, 2003 letter approving these short-term disability benefits, Defendant advised Plaintiff that, to continue benefits beyond October 27, 2003, she would need to provide "objective medical documentation of what complications(s) have occurred and how severe they are." *Id.* (also explaining what was meant by "objective medical documentation").

8.  On October 21, 2005, Plaintiff sent Defendant additional documentation via facsimile with a cover note stating that the documentation "extend[ed] [her] recovery period by an additional month through 11-28-03" and that her doctor had scheduled her for an MRI.  Record at 201 (also stating that her shoulder diagnosis was "now possible [left] rotator cuff tear").  Attached documentation included a Lexington Medical Center-Chapin Work/School Status form on which the "no work" box was checked followed by a notation indicating "one month" and referring to both a planned MRI and orthopedic referral.  The form is signed by Plaintiff but does not appear to be signed by a physician.  Record at 204 (form dated October 16, 2003).

9.  By letter dated October 27, 2003, Defendant extended benefits through November 13, 2003, based on the above submission.  The letter stated, however, that additional documentation would be needed for any further extension.  Record at 199 (letter dated October 27, 2003).

---

[3] The commencement date for benefits was fourteen days after the onset of disability due to a fourteen day elimination period.  Record at 209.

3

10. On November 3, 2003, Plaintiff sent Defendant additional documentation via facsimile including a copy of an MRI report and a new Work/School Status form. Record at 192-98. The latter is dated October 30, 2003, and includes a check in the "no work" box followed by the handwritten notation "1 month-PT Eval/Tx." Record at 195. The MRI report indicates that "There is significant effusion" although there is a blank space between the words "is" and "significant." Under "Impression" the form has a blank space before the words "MR appearance of the left shoulder." Record at 194.

11. Defendant, thereafter, requested records directly from several of Plaintiff's medical providers. *See* Record at 186-190 (November 7, 2003 letters to Drs. Bush, Jolley and Motto[4] seeking medical records); Record at 142, 159 & 163 (November 19, 2003 letters to Plaintiff seeking releases for medical records).

12. Certain of the records obtained from the providers reflected significant differences from the documents which Plaintiff had earlier provided to Defendant by facsimile. Specifically, the copies of the MRI report sent by the medical providers contained critical language missing from the version Plaintiff had provided to Defendant.[5] Similarly, the Work/School Status forms provided by the medical providers for Plaintiff's October visits did not contain either check marks in the "no

---

[4] Dr. Bush was Plaintiff's treating psychologist. Dr. Jolley was a member of the same Lexington Medical Center-Chapin group as Dr. Fulcher and, apparently, Plaintiff's primary treating physician. Dr. Motto was a pain specialist to whom Plaintiff had been referred.

[5] The concluding narrative sentence on the MRI report as provided by the medical providers stated "There is **no** significant effusion" and the sentence following "Impression" read "**Unremarkable** MR appearance of the left shoulder." Record at 155 &185 (emphasis added– words shown in bold correspond to blanks on documents Plaintiff forwarded to Defendant).

4

work" boxes or any comments in the blanks which followed. Record at 146, 147 & 153.[6]

13.     Dr. Jolley's transcribed notes of Plaintiff's October 16, 2003 visit indicate Plaintiff was being seen both for "anxiety related to work and stress" and for "shoulder pain." Record at 154. This record also indicates that the shoulder injury was not work related and that it had caused pain off and on since April 22, 2001. The record does not refer to any out-of-work status. It does, however, indicate Plaintiff is being sent for an MRI to rule out a rotator cuff tear. The notes also indicate Dr. Jolley declined to give "chronic pain medication" but did write prescriptions for Soma to be taken as needed and "a few analgesics."

14.     Dr. Jolley's transcribed notes of Plaintiff's October 30, 2003 visit indicate that Plaintiff "had a MRI that was normal" and that her "anxiety is doing a little better" on medication. Record at 151. This office note makes no reference to an out-of-work status.

15.     Sometime in November, Plaintiff wrote to Defendant enclosing records for one or both of her physical therapy visits in November. The Progress Update form for November 24, 2003, indicates Plaintiff was experiencing "sharp, deep, cs pain; [and complains of] swelling left wrist." Under "Impression/Recommendations" the therapist wrote that the patient's symptoms "are improving per report. Continued [complaints of] pain [with] exercise. However, [patient's] ROM is improving. [Patient] deriving relief from hot pack [and] [electrical] stimulation for her [shoulder symptoms and] CS pain." Record at 164. While it appears Defendant may not have received the

---

[6] Plaintiff concedes that she checked the "no work" box and inserted the relevant language on at least one of the Work/School Status forms she provided to Defendant. She asserts that she did so based on information provided by the doctor and that she did not intend to mislead Defendant. While Plaintiff's decision to fill in the form herself raises concerns, Defendant has not relied on any claim of misrepresentation in any of its denial letters or in its memorandum in support of judgment. The information is, however, included here to explain certain later communications between Plaintiff's attorney and Defendant.

initial evaluation form for November 11, 2003, until sometime later, that form includes the following notation: "Restrictions: No lifting [more than] 10 [pounds] or overhead." Record at 126.

16. The records obtained from Plaintiff's medical providers also included copies of a Work/School Status form dated November 26, 2003 and apparently prepared by Dr. Jolley. Unlike the essentially blank forms obtained from the medical providers for Plaintiff's October visits, this form indicates Plaintiff should be out of work for eight weeks. Record at 134 & 139.[7]

17. Dr. Jolley's office notes for November 26, 2003, state:

> S:   This patient is in for follow-up of left shoulder pain. She has had 5 PT visits, *doing much better*. Her sinus infection is better. She is having a little bit of eye drainage. She would like TorbraDex, it has helped with this in the past. Her anxiety is doing better on Lexapro and Xanax. She is seeing a counselor, Dr. Bush.
>
> O:   GENERAL: Less tearful today. NEURO/MUSCULOSKELETAL: *Increased range of motion of shoulder, still having a lot of trapezius spasm and tenderness.*
>
> P:   *Keep her out of work.* See her back in 6-8 weeks. *I have written a note for her to be out for 8 weeks.* 5 more physical therapy visits.

Record at 132 (emphasis added).

18. On November 18, 2003, Plaintiff's treating psychologist, Melissa V. Bush, Ph.D., wrote to Defendant as follows:

> Pamela Craig has come in for therapy on 6 occasions dealing with Panic Disorder and Depression as a result of anxiety related to work and stress. After being assessed by her Employee Assistance Program, she was referred to me since she needed long-term therapy to enable her to go back to work.
>
> Currently she is on short-term disability fearful and exhausted dealing with a severe shoulder pain requiring physical therapy at the Columbia Rehab Clinic twice a week.

---

[7] Although the copies of the forms were apparently obtained from two different sources, Plaintiff's primary care physician (Dr. Jolley) and her physical therapist, both have the heading for the Lexington Medical Center-Chapin. Thus, the forms were initiated by Dr. Jolley or his office.

> Her panic disorder, severe anxiety, and exhaustion were a consequence of working 160 hours in a two week period, while also being on-call. She has also had anonymous threats made on her life via the telephone that were work related.

Record at 168. *See also* Record at 175 (Treatment Planning and Case Notes indicating condition as "insomnia, panic disorder, exhaustion, [and] shoulder pain requiring physical therapy 2 x week" and indicating an occupational source of the psychological problems including "long hours-severe stress-threatening calls."

19.   On December 8, 2003, Defendant wrote to Plaintiff informing her that it was denying further benefits based on its conclusion that the documentation did not support a finding of "continued total disability beyond October 27, 2003." Record at 137-38. Defendant specifically noted that all records after this date "were therapy notes which do not provide work status information." *Id.*[8] No more specific reasons were given. The letter informed Plaintiff of her rights to appeal the denial. *Id.*

20.   Plaintiff appealed the denial of benefits by letter bearing dates of both December 31, 2003 and January 8, 2004. The later date appears to be the actual date on which the letter was sent via facsimile to Defendant. Record at 122. This letter refers to an attached Certification of Health Care Provider purporting to establish disability from October 27, 2003 though January 21, 2004. *Id.* Plaintiff's letter refers both to her work-related anxiety and stress problems and to continuing problems with her shoulder. In regard to the shoulder, she indicates there are plans to refer her to

---

[8] It is not clear if Defendant had and considered Dr. Jolley's November 26, 2003 records when it issued this denial. The arrangement of the record suggests that it may have had at least one of the Work/School Status forms placing Plaintiff out-of-work for eight weeks from November 26, 2003 forward at the time of this denial. If this is correct, then Defendant was in error in stating it had no medical record placing Plaintiff out-of-work at the time of this denial. For reasons discussed below, however, this error makes no difference to the ultimate validity of Defendant's decision.

a neurologist or orthopedist. Plaintiff also states that she is "unable to control the use of my left arm/hand with pain, numbness and tingling." *Id.* The attached Certification of Health Care Provider form is undated and appears to have been completed primarily in Plaintiff's handwriting. It is, however, signed by Greg Fuller and includes the following notation above his signature: "Pamela Craig is under the ongoing care of Dr. Robert Jolley who has recommended to keep Ms. Craig out of work from 11/20/03 - 1/20/04." Record at 124.[9]

21.  On February 2, 2004, an attorney wrote to Defendant indicating that he would be assisting Ms. Craig in pursuing her appeal. Record at 116-119. He suggests that the denial may be the result of a misunderstanding and acknowledges the illegibility of the records which Plaintiff had submitted.[10]

22.  A few days later, Plaintiff's attorney faxed Defendant an office visit note of Plaintiff's January 15, 2004 appointment with Dr. Jolley. This note states:

> S:    This patient is in with continued problems. I saw her on 11/26/2003. Since then, she has lost her job. We did a FMLA. She had an out of work note. She was turned down for disability and they terminated her position. She has continued to have left shoulder problems, stress, anxiety. She is seeing her counselor. . . . She is concerned about wrongful firing, possible Workman's Comp with stress, maybe some neurological problem causing this left shoulder pain.

---

[9] The records provided by the parties suggest that Dr. Fulcher only saw Plaintiff on September 19, 2003. His office notes of that visit state that he was completing a FMLA form. Nothing in Fulcher's office record, however, would suggest any anticipated disability date beyond the tentative October 27, 2003 back-to-work date contained in his office notes. Nonetheless, as Drs. Jolley and Fulcher were in the same practice, the court assumes that the form reflected Dr. Jolley's opinion of Plaintiff's condition in November of 2003.

[10] This is a point with which the court agrees and which is a frequent difficulty in actions such as the present. Counsel are strongly encouraged to ensure that the court is provided with a legible copy of the relevant documents and, where appropriate, with the parties' interpretation of hard-to-decipher language. Pinpoint citations for all references to the record are also expected.

8

> P:   Will send her to a neurologist to rule out radiculopathy. Dermatologist to look at scalp lesions. Continue Lortab and Lexapro.

Record at 110.

23. On February 19, 2004, Plaintiff's attorney faxed additional supporting documents to Defendant. A number of these documents appear to be duplicates of medical records previously provided and do not, in any case vary, significantly from the records discussed above. Record at 90-98 & 100-108. The transmission also included a February 11, 2004 letter written by Dr. Jolley "To Whom it May Concern." Record at 99. The letter states that Plaintiff had been out of work on his advice due to "left shoulder pain, stress and anxiety," with his last office visits with her being on January 15, 2004 and November 26, 2003. The letter also states that, as of November 26, 2003, Plaintiff "was to be out for 8 weeks with physical therapy." The letter concludes:

> The patient is still undergoing evaluation for this shoulder pain and has been undergoing physical therapy as well as medication for her anxiety and depression. It is my belief at this time that she is unable to have gainful employment. Refer to any letter forthcoming from Dr. Carnes as far as his evaluation of her shoulder.

Record at 99. The transmittal from counsel also includes a February 6, 2003 letter from Dr. Bush stating that: Plaintiff was last seen on December 30, 2003; she was being treated for "depression and panic disorder related to stress on the job and physical problems"; her "progress was poor on 12/30/03"; and "the fact that her disability insurance is not paying bills is adding stress to her life." Record at 89.

24. Dr. Carnes evaluation was completed on February 4, 2004. It is not clear when he forwarded his report to Dr. Jolley, although Jolley apparently did not have the report at the time he wrote the February 11, 2004 letter quoted above. In any case counsel forwarded Carnes' report to Defendant on March 30, 2004. This detailed report indicates that Plaintiff showed "a good range of motion in the left shoulder." Record at 85. Under "Impression," it lists: (1) "Left shoulder pain

with no objective neurologic findings"; and (2) "Anxiety and depression." Record at 86. Dr. Carnes concludes:

> [T]his patient does have a number of issues with her work. Her complaints of discoloration of her left arm, rashes on her left arm, as well as difficulty with weakness. I have told her that I am unable to relate this to a primary neurologic problem. Her examination today shows no objective findings, but she does show a great deal of variation when testing the muscles of the left arm. She also complains of some paresthesias and for this reason I do feel that EMG studies would be reasonable in trying to evaluate this patient. If these studies are unremarkable, however, I really see little to offer this patient from a neurologic standpoint. The patient was interested in getting more Lortab. I have told her, however, that in view of her examination at this stage, that I do not feel comfortable giving this medication unless very specific abnormalities are noted on her studies.

Record at 86.

25.     There is no evidence that the EMG suggested by Dr. Carnes was ever performed. In any case, no evidence of the EMG was provided to Defendant.

26.     On May 7, 2004, a little over a month after receiving Dr. Carnes' report, Defendant wrote Plaintiff's attorney regarding its decision to uphold the denial of benefits. Record at 77-79. The Plan's exclusion of coverage for work-related disabilities was critical to this decision. As the letter notes, Plaintiff's psychological difficulties had been linked to work-related events by all medical providers who had addressed these issues. Further, none of the providers distinguished between the shoulder and the psychological difficulties in suggesting Plaintiff was unable to return to work. At the same time, the objective evaluations of Plaintiff's shoulder (MRI and Dr. Carnes' neurological tests) did not suggest a physical source for Plaintiff's shoulder pain, and at least not for any disabling pain. As before, this letter advised Plaintiff of her right to appeal the decision. Record at 79.[11]

---

[11] This letter also indicates that Plaintiff was ultimately paid benefits for the period beginning September 24, 2003 and ending November 26, 2003. Record at 71. Thus, Plaintiff was paid for a greater period of time than Defendant concedes is supported by the medical documentation.

10

27.     A different attorney, acting in consultation with Plaintiff's initial attorney, wrote to Defendant on May 18, 2004. While challenging the denial of benefits, this letter concedes that work-related "death threats . . . contributed to [Plaintiff's] anxiety and caused her initial medical leave." Record at 69.[12]

28.     Defendant's responsive correspondence to this attorney expresses concern that Plaintiff may have altered her initially provided Work/School Status form(s) and MRI.[13] Record at 66. As noted above, however, Defendant has not relied on this alteration as a basis for denying benefits. Thus, it is relevant only for explaining certain events which followed. *See infra* ¶¶ 29 & 30.

29.     On June 4, 2004, Plaintiff's original (and current) attorney wrote to the South Carolina Attorney General regarding Defendant's suggestion that Plaintiff had engaged in insurance fraud by filing altered records. Record at 53-54. The letter, which was copied to Defendant, attached two letters written by Dr. Jolley on February 18, 2004, and April 2, 2004. Dr. Jolley's two letters stated that, in his opinion, Plaintiff had been totally disabled from September 9, 2004 to the present. The earlier of the two letters is addressed to the Homeowner's Assistance Department of a mortgage company. The second is addressed to Aetna. Neither provides any detail as to the basis

---

[12] The attorney who forwarded the May 18, 2004 letter does not appear to have been involved further in the appeal or this litigation.

[13] This is the first written record indicating Defendant had expressed such a concern. References in other documents suggest that there were oral communications at some time regarding the alterations. *See infra* n. 16. No evidence is provided as to when these communications might have occurred.

of the claim of disability.[14]

30. Plaintiff's attorney also wrote directly to Defendant on the same date, June 4, 2004. Record at 50-52. This letter attaches the letter to the Attorney General as well as the two letters from Dr. Jolley to third parties referenced in the letter to the Attorney General. Although this letter indicates an intent to file a further appeal, it does not purport to be an appeal.[15] Instead, the letter focuses on the concern that Defendant would pursue an insurance fraud claim against Plaintiff. While acknowledging that some alterations were made by Plaintiff to one of the documents, counsel disavows that Plaintiff had any intent to mislead Defendant. Record at 51.[16]

31. Neither this letter nor any other documentation provided to the court indicate that Plaintiff ever specifically challenged the critical distinction made in Defendant's May 7, 2004, denial letter between work-related and non-work-related disabilities. Further, despite counsel's statement in his June 4, 2004 letter that he intended to file a further appeal and provide additional

---

[14] Nonetheless, counsel's letter to the Attorney General states that counsel is representing Plaintiff in regard to a worker's compensation claim. While this representation does not require the conclusion that the worker's compensation claim relates to the same claimed disability, it is at least not inconsistent with this conclusion. Similar comments in Dr. Jolley's records support the same conclusion. *See supra* ¶ 22.

[15] The letter states "Next, we will be submitting the additional documentation necessary to establish the second level appeal. Please forward further correspondence and documentation concerning any matter relating to the STD/LTD claims to me because I will be handling this matter from this point forward." Record at 52.

[16] The letter states "My client, [sic] vehemently denies any insurance fraud or alteration of any documentation." It also states, however, that "one of the two documents that were forwarded [to Defendant] has been specifically explained by my client. The part of the document concerning the out of work statement was recorded by her after she was given those verbal instructions by her doctor. She is a nurse and saw nothing wrong with this and understood that this would be reflected in his records." Record at 51. The court assumes from this statement that the explanation had already been provided to Defendant prior to this exchange. In any case, Defendant does not here maintain that Plaintiff has committed fraud.

documentation, there is no evidence that any further appeal was filed or any additional documentation was submitted.

## CONCLUSIONS OF LAW

32.     The present action and underlying plan are governed by ERISA and Plaintiff's claims arise solely under that statute.  Joint Stipulation ¶ 1.

33.     Plaintiff has exhausted all administrative remedies.  Joint Stipulation ¶ 2.

34.     Defendant's denial of benefits must be reviewed under the modified abuse of discretion standard of review.  Joint Stipulation ¶ 3.  Under this standard, an ERISA fiduciary may resolve evidentiary conflicts in its own favor but only where the evidence relied on is substantial. *Stup v. UNUM Life Ins. Co. of America,* 390 F.3d 301 (4th Cir. 2004).

35.     An ERISA fiduciary is not required to accord special weight to the decision of a treating physician. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003).  Nonetheless, an ERISA fiduciary may not "arbitrarily disregard [a claimant's] reliable evidence, including the opinion of [the claimant's] treating physician." *Stup*, 390 F.3d at 309, n. 5.

36.     The opinions on which Plaintiff relies do not support the conclusion that she was disabled by her shoulder condition after November 26, 2003, the point when Defendant ceased paying disability benefits.  For instance, Dr. Fulcher's opinion that Plaintiff was disabled relates only to the period from September 9 though October 27, 2003, and does not differentiate between Plaintiff's work-related psychological condition and non-work-related physical condition.  Dr. Jolley, likewise, makes no such distinction in any of his opinions which do relate to the relevant period.  Dr. Bush's opinion that Plaintiff was disabled after November 26, 2003, is, likewise, undifferentiated as to causation of the disability.  In any case, as a psychologist, Dr. Bush would not be qualified to

offer an opinion as to Plaintiff's physical condition.

37. Various medical records support the conclusion that whatever pain Plaintiff may have suffered from her shoulder was not disabling, at least after November 26, 2003. Most critically, the objective tests (MRI and neurological) failed to find any physical cause of Plaintiff's shoulder pain. Dr. Jolley's office notes from November 26, 2003, as well as the physical therapist's notes from November 24, 2003 also suggest that Plaintiff's shoulder pain problems had diminished, though not completely resolved, by November 26, 2003. *Supra* ¶¶ 15 & 17.

38. Plaintiff's argument that her "disability has nothing to do with her anxiety, panic disorder or depression" cannot modify this conclusion. *See* Plaintiff's memorandum at 5. This is because the medical records submitted by Drs. Jolley and Bush consistently refer to both Plaintiff's shoulder and her psychological difficulties in opining that Plaintiff was disabled. *See, e.g., supra* ¶¶17-18. The only time either did not refer to both conditions in opining that Plaintiff was disabled is in the two letters from Dr. Jolley to third parties, provided to Defendant on June 4, 2004, which do not indicate *any* specific causes of the disability. *Supra* ¶ 29. Further, as noted above, Dr. Bush was qualified only to give an opinion as to Plaintiff's psychological condition. Therefore, in offering an opinion that Plaintiff was disabled, she necessarily was focusing on Plaintiff's anxiety, panic disorder and depression.

39. The physical therapy notes, while offering opinions specific to the shoulder problems, are insufficient to require Defendant to find that Plaintiff was disabled by the shoulder condition after November 26, 2003. First, Plaintiff cannot rely on the "history" section of her physical therapy records as evidence of restrictions imposed by a medical provider. This is because the notes in this section of the report are only a recitation of the patient's complaints. *See* Plaintiff's memorandum

14

at 5 (suggesting a series of limitations based on comments in the history section of her physical therapy reports). Second, the only restriction imposed by the physical therapist is reflected in the November 11, 2003, prohibition against lifting greater than 10 pounds or overhead.[17] Record at 126. No specific time frame for this limitation is, however, provided. The next physical therapy report, dated November 24, 2003, notes that Plaintiff had improved. While it is possible that the therapist intended the earlier stated restriction to continue, there is no reference to any further restriction in this report. Thus, the evidence as to the therapist's view is, at best, ambiguous.. In any case, in light of the objective evidence relating to Plaintiff's shoulder, the court concludes that Defendant was not required to accept the single statement in the November 11, 2003, physical therapist's report as requiring a finding of disability based on Plaintiff's shoulder condition after November 26, 2003.

40.     Plaintiff's claim that Defendant unreasonably delayed a decision on the initial appeal is neither independently actionable nor factually supported. *See* Plaintiff memorandum at 6-7 (indicating the appeal was first filed in December 31, 2003 and that Plaintiff heard nothing from Jefferson Pilot until her counsel received the May 7, 2004 denial letter). This claim ignores the communications between Plaintiff's attorney and Defendant which began when Plaintiff's attorney sent his letter of representation to Defendant on February 2, 2004, acknowledging that the documents Plaintiff had provided were illegible and indicating an intent to discuss the matter by phone before sending additional documentation. Counsel then sent the promised documentation by facsimile on three separate dates, the last being on March 30, 2004. Thus, the "delay" between receipt of the additional documentation and Defendant's decision on the appeal was only from March 30, 2004 to

---

[17] The court presumes without deciding that a restriction against lifting more than ten pounds or lifting overhead would be a disabling condition in light of the full scope of Plaintiff's duties.

15

May 7, 2004.[18]

41.     Examined under the modified abuse of discretion standard of review, the court finds that Defendant's denial of benefits was not an abuse of discretion in light of the Plan's exclusion of work-related disabilities and the record evidence discussed above.

## CONCLUSION

For the reasons set forth above, the court directs entry of judgment in favor of Defendant on the issue of liability. The court declines to award Defendant any attorneys' fees.

IT IS SO ORDERED.

S/ Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
September 19, 2005

C:\temp\notesB0AA3C\05-950 Craig v jeff pilot (ltd disab-jdmt for def).wpd

---

[18] No evidence is presented as to what, if any, telephone communications were ongoing during this period, although the manner in which the records were forwarded (via facsimile) suggests there may have been related telephone calls.